H. H. HARRELL, Administrator, v. ALABAMA GREAT SOUTH-ERN RAILROAD.

Eastern Section.   February 26, 1927.

Petition for Certiorari denied by Supreme Court, June 11, 1927.

1. **Trial. A litigant must recover, if at all, upon facts alleged in declaration.**
    A litigant can not allege one state of facts and recover upon proof of another.

2. **Negligence. Pleading. Plaintiff is bound by special negligence pleaded.**
    Where the petition alleges that the injury was the result of negligence, and then recites the specific acts of negligence relied on, the court should confine its instructions to those acts, and it is error to charge the jury to find for the plaintiff if the defendant was guilty of negligence in any respect. So also it is error to refuse to instruct that no recovery can be had for negligent acts not covered by the pleadings.

3. **Railroads. Train of cars being moved from one place to be turned over to another crew, held not engaged in a switching operation.**
    Where a train of cars was being moved from one part of town to another to be turned over to another train crew, and the evidence further showed that no switching was done during the operation, held that the train was not switching and was required to exercise all statutory precautions for the preventions of accidents.

Appeal in Error from Circuit Court, Hamilton County; Hon. Oscar Yarnell, Judge.

Reversed and remanded for a new trial.

J. W. Anderson, Ed Bass and Tatum & Tatum, of Chattanooga, for plaintiff in error.

Allison and Lynch & Phillips, of Chattanooga, for defendant in error.

SNODGRASS, J.  This is an action for damages.  The plaintiff's intestate was run over by a train of cars near her home on Avenue J, between 31st and 32nd streets in the City of Chattanooga, where the main line of the Belt Railroad ran along Avenue J. near her residence.  She was evidently desiring to cross Avenue

J. from the east side, where she resided, to the west side, and as the railroad track and the road ran longitudinally on Avenue J, she had to cross the railroad to carry out her purpose. She had an electric iron in her hand and evidently the errand on which she had set forth was in some way connected with it. It was at one o'clock on the 1st day of April, 1925. Apparently she was killed instantly. Her body was mangled and dismembered, and her head crushed and severed. She was a large, fleshy woman, fifty-five years old, about five feet two inches in height, weighed about 180 pounds, and was in good health. Her nephew, a young boy, came the nearest to being an eye-witness to the fatal and lamentable event, which is claimed to have occurred as a result of the negligence of the defendant. This Avenue J. ran north and south, was crossed by streets running east and west in this vicinity, numbered in the direction from north to south as 30th, 31st, 32nd, 33rd and 34th streets, which was a populous part or suburb of the City of Chattanooga.

The train of cars, said by the railroad to have been loaded, and about twenty in number, had been taken from the main line of the Belt Road inside the city limits at Highland Park avenue, and pushed by an engine some four and a half miles toward the suburbs, to be transferred or distributed by a switching crew to other parts of the city; it being designed also to swap engines when this train of cars was delivered to the other train crew, which evidently was expected to be met about or near the place of the accident. This crew in question did not do any switching. The train was picked up, as stated, on the main line of the belt road, and was never taken off or any cars switched. The crew had engine No. 6572, and were taking this train and engine to change with the crew using engine No. 7054, and at the time of the accident the train was being pushed north on Avenue J. by the engine behind, at the time being operated by the Alabama Great Southern Railroad.

It was claimed by Mr. Guinn, foreman, he said, of a switch engine, who was in charge of this train of cars, that when his train stopped the lead or extreme south car from the engine reached to within about forty feet of 32nd street, and that the engine of the train blocked 30th street; that he cut his engine loose so as to enable the traffic to cross. It was claimed he only stopped about fifteen minutes, and that during this entire time the train was not cut or disconnected in any way, save as stated, when the engine withdrew temporarily at 30th street to accommodate the traffic. He states that his next move was to couple up and shove the cars further south about eight or nine car lengths and stop. This he claims shoved the cars across 32nd

street, but he does not state how far. He says the cars stood there between two, and 'three minutes, when they backed north about 200 feet, he thought, north of 32nd street, and then they saw the lady lying in between the tracks. There were three of them there, and he does not know which discovered her first. He said the blood, limbs, clothing and stuff was south of the body about ten or twelve, or maybe twenty feet. On re-direct examination he was asked:

"Q. From the time your train first stopped, with this end of the box car a few feet north of 32nd street, from that time until the body was found had your train or not, a part of your train, occupied the space that entire time where the body was found? A. Yes sir, yes sir.

"Q. At no time from the time you first went in there and stopped with your engine down about 30th street, and the hind end up there at 32nd street, at that point where the body was found, had a part of your train been over that very spot and located on it all of that time? A. The space was all covered up from about forty feet of 32nd street back to this lumber yard at 30th street. It was all covered up back to the other crossing, to the 30th street crossing I mean.

"Q. In other words, your engine was on the north end? A. Yes sir.

"Q. And this movement that you made to the south, had your engine ever reached the point where the body was found? A. No sir, no sir, it was right around 12, 10 to 12 cars, the engine lacked that much of getting there."

He had ridden, he said, on this front end of the car until it stopped, and then had gotten down, and had walked down across 32nd street to see what the other engine was doing, which was still on down at least two blocks further, in the neighborhood of 34th street, and from that point he gave the signal.

The other members of the crew substantially corroborate Mr. Guinn as to these particulars, as far as their attention was drawn to them. Mr. Guinn testified that the train was not disconnected otherwise than as indicated at the engine; that it was connected with air brakes, and that when cars are disconnected at streets to permit passage over cross-streets, that the man on the engine does that; that when you cut the train and pull back you turn an angle cock on there, but when you want to leave an opening, then somebody had to couple the air and turn it loose. Asked what caused him to stop, Mr. Guinn said "there was an engine on down about—he could not say for sure—about half a mile, though, something like that, he did not remember the distance." He did not know whether it was about 33rd or 34th street, or whether

between 32nd or 33rd street; it was down that way, but the Chattanooga Wagon Company was where it was. It appears that this engine he saw was the one he was to meet. Asked again why he stayed down there fifteen or twenty minutes, he said:

"The thing being on the main line, I had to shove these cars by him. He had to get in a passing track and let me shove by him. He was right down on a little ways from me."

As stated, he had gotten off the south car of his train, and had walked down across 32nd street to see what this engine was going to do. He did not go down to it, but when the engine shoved on down to that next street down there, to the Wagon works, he expected him to get in the clear down there. There was not room to hold him, and he backed on south. The engine he had (7054) blew the whistle one time to stop, and when he did the witness said he stopped this train he had, with twenty cars and engine, and stood there. He said it stopped eight or nine cars over 32nd street; that the other engine whistled three times to back up, and that he knew he could not get in the clear down there, and the engine, the train and cut of cars stood there between two and three minutes, and backed north. This witness stated also, that in the meantime the other fellow had done some switching.

On the other hand the deceased, Mrs. Harrell, lived on Avenue J. in the second house north of 32nd street, and her nephew, a boy, testifies that on the day plaintiff's intestate was killed he came on Avenue J. between 33rd and 34th street, and walked north on Avenue J. on the west side, to keep his aunt, the deceased from seeing him, and when up there at 31st street he got into an empty box car, and then he saw his aunt Kate, the deceased, and jumped back. (She had caused him to get a whipping for riding in the cars, which he had been doing two or three days before that.) He said he had started to jump out of the car, and his Aunt Kate was coming out of the gate, and he jumped back in, and when he looked back again she was standing right down there by her gate, not exactly in front, but slanting, and nearer 32nd street. He says he thinks she saw him; that he looked out again, and she stepped between the cars, and the cars hit. When the cars hit, he said, the jar caused him to fall out of the car; that they hit with a whole lot of force, and that coming from the 30th street they hit the other three on the north end. He said he was paying attention to his Aunt Kate when they hit, and he was not holding and fell out in the ditch. That then he told the fireman that he had knocked a woman down, and that he (the fireman) went down there and looked, and came back and told the engineer to stop, and he didn't pay any more attention; that he went to the schoolhouse to tell Adair. The

boy had been all around there and observed the situation, and says it had been half an hour before he got into the box car. The boy says the cars extended up to 30th street, and he got into an empty box car near or at 31st street, and from the west side of the railroad, and that in walking up he saw an engine between 33rd and 32nd street down there on the side track; that it had one or two cars onto it; that it was on the spinningmill line that goes off, and was standing still over there; that three cars extended up to about 32nd street, and cars extended all the way down to 31st street, between 31st and 32nd. The boy places an opening between these cars about half the length of a rail, right down slanting across from the gate of the deceased, and says he saw her stop down there, saw her step between the cars, where she was run over, and says that there was no flagman or trainman anywhere between him and where she got run over, and says there was no flagman or anybody else down at that end of the train flagging or giving any signals or warning. He said his aunt had an electric iron in her hand.

Theodore Davenport testified that he went through an opening between cars at the place where the deceased was killed. His purpose was to deliver groceries at a place just south of the house where the deceased lived, between 31st and 32nd street. He was hauling the groceries down in a truck. He entered Avenue J. on 31st street, and turned south on said avenue on the west side; that there was a train of cars standing there as he went in, and he continued south to an opening, and left his truck and went through that open space where the train was uncoupled or disconnected, and delivered his groceries on the east side of the house just next to the house of the deceased. He said the opening looked to be about half of a rail, fifteen or twenty feet, something like that. He saw the deceased as he was going back through the opening to his truck. She was standing at her gate with an electric iron in her hand. He had left his truck with the engine running, and got in and drove off, and did not notice anyone else at the place, but was not paying much attention. Heard of her death after he got back to the coalyard.

Mrs. Jordan lived on Avenue J. fronting on the same, in the third house on corner coming from 32nd street down to 31st, next to H. H. Harrell, whose mother, the deceased, lived just across the street. The first thing that attracted her attention was the crash of cars, and when she came out of the house Mrs. Harrell had been killed. She was in her kitchen at the time, but had been sitting in the front room watching the crossing, as she was desirous to get across, and thinking she would cross there herself to make a call at Everett's house on the other side. She had

been lying down, and when she got up the cars were there. She had noticed them fifteen or twenty minutes and observed the opening as between her house and Mrs. Everett's, next to Mrs. Harrell's, not directly in front of Mrs. Harrell's, but between her house and another. The opening was between box cars. The first thing that attracted her attention, she said, was the engine striking the cars, and said it was unusually loud. That when the engine kicks the cars, naturally it makes more noise than when the cars are together; that it is just a short bump when they are coupled, but if there is an opening to them it makes more noise and jars the house; it was like running cars coming in contact with standing cars. She stated on cross-examination that she knew of no reason for separating the cut of cars in the middle of the block there, but she had seen the cars cut there before. She had been living there for eleven years, and had seen them cut there; though not supposed to, they crossed there. One of the train men handed her an electric iron as she started out of her gate to Mrs. Harrell's.

Mrs. Richardson, who lived on the west side of Avenue J. in the second house north of 32nd street, was attracted by a big clash of the train. Her children were out in the front yard, and that brought her to the window. She described it as big and hard, and then it went on between the cars, and when she got to where she could observe the cars were still moving toward the mill. The crash appeared to have come a short distance north of her house.

Mrs. John Everett, who lived in the first house north of where Mrs. Harrell lived, was attracted by a loud noise of the cars bumping together. The noise caused Mrs. White, who was visiting her, to scream. The noise was described as making a terrible racket, like it kicked some cars against some standing still. Mrs. White testifies that the crash was so loud that she, being nervous, screamed when she heard the noise. She said it sounded like cars coming together, "I didn't know, but an awful racket."

At the close of defendant's proof Judge Allison stated that they had the crew of the other train, but said:

"Under your proof there is not any necessity of bringing them in."

To which Mr. Tatum replied:

"I do not understand that the other train was ever north of 32nd street."

"The Court: There is no insistence that it was.

"Mr. Allison: We will close.

"The Court: Any further evidence in rebuttal?

"Mr. Tatum: Nothing."

Thereupon the motion of defendant to direct a verdict was renewed, which was, that if the evidence introduced be true, the plaintiff has not made out a case under either count of the declaration to which was also added an additional ground, that the proof does not conform to the allegations of the declaration.

In one count of the declaration liability was predicated under the statute, on the alleged failure to observe subsection 4 of section 1574 of the code, and the other was a count of common-law negligence, the failure to observe that care to protect the deceased from injury which the situation demanded.

The motion was sustained as to the count presenting statutory liability, the court announcing that he would submit the case to the jury under the common-law count. Whereupon the case was submitted to the jury, as indicated, and they returned a verdict in favor of the defendant.

Motion for a new trial was made by the plaintiff, who is now plaintiff in error, which, being overruled, he has appealed and assigned errors. The parties will be referred to as they were styled below.

The first error assigned is, in effect, that the court erred in refusing to submit the case to the jury upon the statutory count of liability, and this assignment we think is well taken.

Whatever may have been the employment of the other train at or near the place where the accident happened, the train that effected the injury was not engaged in any switching operation. It had come for a distance of four and a half miles on the main line, as the proof shows, to deliver this train of cars for other destination than at the place of this accident, and had stopped for a considerable time watching the other train, which had done some switching. It would appear from the proof that the disconnected cars were cars belonging to that other train that had been switching. The crew of this train was not introduced, the defendant's counsel deciding from the plaintiff's proof that it would not be necessary, and it was stated by plaintiff's counsel that he did not understand that the other train was ever north of 32nd street. But indeed it is insisted if not shown by the evidence, that a number of boxcars had been deposited just south of 32nd street by some agency, and we must conclude from the defendant's proof that the train of cars being pushed north was never broken save at 30th street, when the engine was withdrawn for awhile to accommodate traffic, and that therefore these disconnected cars did not belong to this train. The natural inference is that these disconnected cars had been placed there by the other train in its switching operations, and that the opening referred to was thus effected. The plaintiff's proof does not under-

take to account specifically as to how the situation came about. It only undertakes to show that it existed, subject to the legitimate inferences that might be drawn therefrom in view of what was going on. However, that there were detached cars south of the train being pushed north, to effect such an opening, seems to have been controverted by the defendant, who it appears also endeavored to show that their train, when stopped, covered the space where the deceased was killed, and, being coupled up and merely awaiting opportunity to continue south, the inference sought by this to be matured is obvious; that is, that the deceased was endeavoring to go under the train, and that, too, at the time just before it was being pulled back north after it had made its southward movement. This accounts for the two excerpts in the charge complained of in assignments 5 and 6, as follows:

> "Now if you believe from the evidence in this case, gentlemen, that this deceased undertook to cross that railroad track while the train was there by crawling under the train or stooping down getting under it, passing under the train as it stood there, there can be no recovery in this case, and you will so find and return a verdict for the defendant."

> "If she undertook to cross this railroad track by going underneath that train she is guilty of such contributory negligence as a matter of law that her administrator can not recover in this cause."

Confined to this aspect of the proof, we think the two propositions were accurately and properly given; and, too, in view of the specific allegations in the declaration as to where and how the injury occurred, which were as follows: "While passing immediately to the rear of a train consisting of a large number of freight cars and engine, which was then and for sometime had been standing on said railroad tracks, and while in the exercise of due care for her own safety, the defendant, through its agents, servants and employees, suddenly, negligently, and with great force, and without warning, started said train in rapid motion, backing it over plaintiff's intestate," etc., etc. He might have said to the jury that proof that the injury occurred while the deceased was crawling under the train, would not support the allegations in the declaration.

A litigant can not allege one state of facts and recover upon proof of another. Johnson v. Luckadoo, 12 Heisk., 270-275; E. Tenn. & Western N. C. R. R. Co. v. Collins, 85 Tenn., 227 S. W., 1, 883; E. Tenn. Coal Co. v. Daniel, 100 Tenn., 65, 42 S. W., 1062; E. Tenn. & Western N. C. R. R. Co. v. Walter C. Lindamood, 111 Tenn., 417, 78 S. W., 99; Moore v. Fletcher, 145 Tenn., 97, 236 S W., 924.

"Where the petition alleges that the injury was the result of negligence, and then recites the specific acts of negligence relied on, the court should confine its instructions to those acts, and it is error to charge the jury to find for the plaintiff if the defendant was guilty of negligence in any respect. So also it is error to refuse to instruct that no recovery can be had for negligent acts not covered by the pleadings.'' 29 Cyc., 646.

And, too, we think that, notwithstanding plaintiff may have insisted, or it might have been his theory that the train of cars causing the accident ran into some other cars standing on the main line, and that these standing cars were not a part of the train causing the accident, yet if the accident was caused by the front cars of the train being shoved, there would still be reason for which the jury might have found a liability, notwithstanding there may have been no cars south. However, if there were no detached cars standing south of the train being shoved, a strange hallucination must have affected the witnesses of the defendant, or they have sworn falsely. Besides, if this were true, then there would have been no need of the deceased crawling under the train, as, according to the plaintiff's proof, before the southward movement the extreme southward car had not reached to 32nd street, which would have afforded ample room for the deceased to have crossed. But it is really contended in defendant's proof that the deceased was killed in the withdrawal movement northward; that she was crawling under the train at the time. There is proof from which this inference might have been drawn, and its credibility, though extremely questionable, was a matter for the determination of the jury. Nevertheless we do not think they should have been told, under the circumstances, that before the plaintiff could recover they would have to find that there were other cars not a part of the train in question standing upon the main line.

With the statutory count out, it can not be said that there is no evidence to sustain the verdict, as insisted in the second assignment.

The third assignment, as to the weight of the evidence, is not available here.

The second, third, fifth and sixth assignments are overruled. As indicated, the first and fourth are sustained.

We are of opinion that the train of cars that did the injury was being operated in violation of the law, as it was not brought within the operation of any of the excepted cases, and itself was not engaged in any switching operation at the time it did the injury. It had come a long distance on the main line, and, seeing the engine it was to meet doubtless engaged in switching operations, had stopped temporarily, with the engine at 30th street, and its

forward car down to near 32nd street. The engine that was pushing these cars withdrew from the train to allow an opening for traffic at 30th, but when it connected again with its train it still moved forward on the main line with the purpose of reaching its destination, which had yet to be attained. It was at no flag station, but in the streets of the city. There may have been a passing track, or a spur track on down farther south, but this train had not reached it.

The statutory precautions for the prevention of accidents apply where a railroad company operates its trains over the streets of a city outside of the limits of the company's yards and depot grounds. Railroad v. Martin, 113 Tenn., 266, 87 S. W., 418; Railroad v. Dies, 98 Tenn., 655-60, 41 S. W., 860; Railroad v. House, 96 Tenn., 552, 35 S. W., 561; Railroad Co. v. Wilson, 90 Tenn., 271, 16 S. W., 613.

We think the court was in error, therefore, in refusing to submit the case on the statutory count, and in the charge given, as specified in the fourth assignment.

It results, therefore, that the case is reversed and remanded for a new trial upon both counts of the declaration.

Portrum and Thompson, JJ., concur.